## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| **REBEKAH KURIMSKI, on behalf of herself and all others similarly situated,** | : | |
| | : | |
| **Plaintiff,** | : | **CIVIL ACTION NO.:** 9:21-cv-80727 |
| | : | |
| **v.** | : | |
| | : | |
| **SHELL OIL COMPANY,** | : | |
| | : | |
| **Defendant.** | : | |
| _____ | : | |

## CLASS ACTION COMPLAINT

Plaintiff REBEKAH KURIMSKI ("Plaintiff") individually and on behalf of all others similarly situated, brings this action against Defendant Shell Oil Company ("Shell" or "Defendant") to obtain damages, restitution, and injunctive relief for the Class, as defined below, from Defendant. Plaintiff makes the following allegations upon information and belief, except as to her own actions, the investigation of her counsel, and the facts that are a matter of public record.

## NATURE OF THE ACTION

1.     This class action is brought on behalf of a class of consumers who purchased gasoline with a debit card and were unknowingly charged an undisclosed fee by Defendant, in direct violation of Florida's Consumer Protection Laws. This action seeks to end Defendant's knowing, intentional, and deliberate payment processing scheme through which it continues to collect substantial profits from consumers, many of whom cannot afford to take an additional financial hit from Shell.

1

2.    Shell gasoline is sold to consumers through its network of wholly owned, franchised, leased, and branded dealers across the country and the state of Florida.

3.    Defendant sells its products through a network of Shell-branded gasoline stations in the United States, in addition to offering marketing services and business support to its independently operated, licensed, and/or franchised Shell stations.

4.    Defendant collects royalties from its licensees and/or franchisees and therefore has a direct stake in the success of its Shell-branded dealers.

5.    To drive sales and increase their own revenue, Defendant has engaged in a deceptive pricing scheme which misleads consumers into believing they will be charged a lower price for gasoline purchases made with debit cards, when in reality consumers are charged a higher "credit" price for these transactions.

6.    By this action, Plaintiff seeks damages on behalf of the Class as defined herein arising from Shell's false, deceptive, and unlawful advertising scheme, as well as injunctive and equitable relief to end Shell's scheme.

## PARTIES

7.    Plaintiff is a resident and citizen of Delray Beach, Palm Beach County, Florida.

8.    Defendant, Shell Oil Company is a Delaware corporation with its principal place of business in Houston, Texas. Shell Oil is the United States based subsidiary of Royal Dutch Shell, and is a natural gas producer, natural gas marketer, gasoline marketer, and petrochemical manufacturer.

## JURISDICTION AND VENUE

9.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because at least one member

of the Class, as defined below, is a citizen of a different state than Defendant, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interest and costs.

10.     This Court has personal jurisdiction over this action because Defendant ha sufficient minimum contacts with this District and has purposefully availed itself of the privilege of doing business in this District such that it could reasonably foresee litigation being brought in this District.

11.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## DEFENDANT'S BUSINESS

12.     Defendant refines and markets gasoline and other petroleum products under the Shell brand name, selling petroleum products to approximately 14,000 Shell-branded retail outlets.

13.     Shell is number one in the industry in branded gasoline stations, and number one in total gallons of gasoline sold in the United States.

14.     With 75 percent of all Americans living within five miles of a Shell-branded gasoline station, Defendant serves, on average, more than six million customers per day and sell approximately 19 billion gallons of gasoline per year, most of which is purchased by customers' credit and/or debit cards issued by banks, banking associations, and financial institutions throughout the United States.

15.     Shell-branded gasoline stations have several different ownership structures. Some stations are corporately owned and operated, while others operate as franchises or authorized

dealers. Approximately 1/3 of Shell stations are managed and operated by Shell Retail Licensees.[1] All Shell stations which are not corporately owned and operated are referred to herein as "Dealers."[2]

16.     With regard to its Retail License model, Defendant offers licensees access to business development tools to operate a profitable business. On their website, Defendant makes the following representations[3]:

> Together, we'll help you deliver a rewarding customer experience that will drive footfall, **boost revenue and increase your margins**, all while reducing operational costs and risk. Our global expertise, combined with your local knowledge, will empower you to become a successful, profitable retailer under the banner of the world's largest mobility retail brand.
>
> Shell Retail licensees can accelerate growth in their business by leveraging our strong brand value and the 'franchising' type support package we offer them to be competitive in the market today and tomorrow. (emphasis added)

17.     Defendant specifically represents that "Shell Retail Licensees can enjoy greater volume sales and higher margins" than they would with other gasoline brands.[4]

18.     Part of Shell's "franchising"-type support for its Retail licensees includes providing "real business value," such as "proactive" support in redesigning fuel station store layouts, and access to Shell's marketing and promotional materials.

19.     Dealers are required to use Defendant's own payment processing system. As part of its agreement with licensees, Defendant processes all of their Dealers' daily credit and debit

---

[1] https://www.shell.com/business-customers/shell-retail-licensing.html (last accessed April 12, 2021)

[2] "Dealers" may include franchisees, retail licensees, or any other ownership or management structure in which Shell is neither the owner nor the operator.

[3] *Id.*

[4] https://www.shell.com/business-customers/shell-retail-licensing/accelerate-your-business-growth.html (last accessed April 12, 2021)

4

card sales in batches through its own computerized Electronic Point of Sale system, and then charges the Dealers a processing fee.

20.     "Split Pricing" is one method by which Shell helps generate additional sales and revenue from its gas stations. This two-tiered pricing program offers gasoline for sale at a "credit" price and a slightly lower "cash" price.

21.     Split Pricing generates additional sales and revenues by encouraging cost-conscious consumers to seek out Shell stations in order take advantage of the "discounted" price for using a payment method other than a credit card.

22.     Shell stations accept multiple methods of payment for gasoline, including cash, credit cards (including two Shell-branded credit cards), debit cards, pre-paid debit cards (i.e. Visa Prepaid cards).

23.     Split Pricing results in additional sales and revenues for Shell from the holders of Shell's proprietary Shell-branded credit card (the "Shell Card"). One of the key benefits to the Shell Card is that, despite being a credit card, Shell provides cardholders with a $0.10/ per gallon discount when using the card—making the Shell Card price equivalent to the lower "cash price". Without its Split Pricing scheme, the Shell Card would lose much of its appeal.

24.     Split Pricing also results in revenue for Shell in the form of additional payment processing fees. Because Shell charges its Dealers a fee for every payment card it processes, Shell increases its profits any time a customer elects to use a card for payment rather than cash. Shell's deceptive pricing scheme encourages customers to use their debit card in order to obtain the lower cash price-- in part due to the convenience of being able to pay at the pump. Shell collects a payment processing fee from its Dealer every time a debit card is used in lieu of cash.

25.     In a 2019 study from GasBuddy.com, more than 1,600 consumers were surveyed in an attempt to better understand the payment methods used for fuel purchases and the reasons behind each payment method.[5] Over half of respondents (51%) stated that they used a debit card as their primary payment method for fuel, despite the fact that the vast majority (91%) owned at least one credit card. A significant number of debit card users chose debit for fuel payments because they receive a discount off of the credit card price on gasoline.[6]

26.     Consumers consider debit cards to be a form of cash. A debit card looks like a credit card but works like an electronic check. When used at a retail store, payment is deducted directly from a checking or savings account.[7]

27.     Defendant requires its Dealers to use fuel pumps which include an integrated point-of-sale system (POS). The POS is labeled with signage created and/or provided by Shell which indicates the types of fuel available and their respective prices. Some of Shell's pumps contain displays which indicate Shell's Split Pricing per gallon for cash versus credit purchases.  A picture of a Shell gas pump displaying Split Pricing is produced below:

---

[5] https://www.gasbuddy.com/newsroom/pressrelease/819 (last accessed April 12, 2021)
[6] *Id*.
[7] https://dfi.wa.gov/financial-education/information/debit-cards-frequently-asked-questions (last accessed April 12, 2021)



28.     Defendant's POS accepts a variety of electronic payment methods, including credit cards, debit cards, and Shell gift cards, allowing customers to "Pay-at-the-Pump". Customers paying with cash are required to pre-pay a cashier before fueling, as the POS cannot process cash transactions.

29.     In addition to displaying Shell's Split Pricing on the fuel pumps, many Shell stations also advertise their Split Pricing on exterior signage which can be viewed from nearby roadways. An example of this exterior signage is displayed below:





30.     Shell's pricing scheme is false, deceptive, and misleading to reasonable consumers who purchase gasoline with a debit card because, contrary to the expectations of reasonable consumers, Shell treats debit cards like credit cards, charging unsuspecting consumers the higher "credit" price rather than the advertised "cash" price.

31.     Because the difference between the advertised cash and credit prices is $0.10 higher per gallon, reasonable customers are unlikely to realize that the price displayed on the fuel pump and/or on their sales receipt is anything other than the "cash" price that they expected to pay.

32.     Shell's advertised "cash" and "credit" is deceptive because when presented with a "cash" price and a "credit" price, reasonable consumers will invariably expect to pay Shell's advertised "cash" price rather than the "credit" price because  a debit card is not a credit card.

33.     Whereas an individual must demonstrate a positive credit history in order to obtain a credit card, virtually anyone with a checking account can obtain a debit card to spend the money in their checking account in a safe and convenient manner. Reasonable consumers who cannot obtain a credit card, including low income earning Americans and those with poor credit histories, are very aware of the fact that their debit card is not a credit card.

34.     Because reasonable consumers believe that debit cards are not credit cards, they are deceived when Shell charges anything over the advertised "cash" price on their debit card purchases of Shell-branded gasoline without any prior disclosure, in clear violation of Florida law.

35.     Shell, not its Dealers, created, designed, reviewed, and approved the deceptive advertising with actual knowledge that its Split Pricing signage is deceptively designed.

36.     Shell has the sole ability, discretion, and authority to design the appearance of the signage and all other elements of its Shell-branded Dealers.

37.     Shell deliberately designed its Split Pricing signage in a manner that deceives consumers with the specific intent of increasing its own profits through gasoline to deceived consumers and inflated debit card processing fees incurred by Dealers.

38.     Despite having actual knowledge that consumers are being misled by its Split Pricing signage, Shell deliberately continues to create, design, review, and approve new iterations of its signage that continue to cause consumer deception.

39.     Shell, not its Dealers, disseminated, displayed, and controlled its deceptive signage with actual knowledge that its signage is deceptive.

40.     Under its Retail Licensing Agreement and other similar dealer agreements, Shell provides its deceptive Split Pricing signage to its Dealers and retains the sole discretion to dictate and change the number, type, and location of the signage installed at its Dealers.

41.     Under the terms of those same agreements, Shell maintains ownership of its signage and requires Dealers to return signage upon the termination of their relationship with Shell.

42.     Despite having actual knowledge that its Split Pricing signage is deceptive to consumers, Shell deliberately continues to disseminate, display, and control deceptive signage at Shell-branded Dealers in order to continue profiting off the consumer deception that its signage causes.

43.     Shell, not its Dealers, processes debit cards at the higher credit price with actual knowledge that consumers expect to pay the cash price.

44.     Shell, directly and/or through Shell's payment processing agent, processes debit card payments made at Shell-branded Dealers through its Network.

45.     Despite having actual knowledge that consumers consider a debit card to be a form of cash and expect to pay the cash price, Shell's company policy is to charge the higher credit price

on debit card payments. Shell collects payments directly from consumers and, after skimming its profits and processing fees, pays the remainder to the Dealer where the sale was made.

46.     Despite having actual knowledge that consumers receive no disclosure of Shell's debit card processing policy, Shell deliberately refuses to change its policy in order to continue profiting off of unsuspecting consumers.

47.     Shell, not its Dealers, deliberately refuses to disclose, or require disclosure of, its debit card processing policy, despite having actual knowledge of consumer deception.

48.     Through contractual agreements with its dealers, Shell has the sole discretion and authority over the disclosures that consumers receive.

49.     Debit card fees are material to consumers, and because Shell has superior knowledge of the fees it imposes on unsuspecting consumers, it has a duty to disclose those fees.

50.     Despite having actual knowledge that consumers find Shell's debit card processing policy to be deceptive, Shell deliberately refuses to disclose its debit card processing policy in order to continue profiting off the resulting consumer deception.

51.     In the alternative, Shell is directly liable for aiding and abetting unlawful and deceptive acts and practices that violate the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"). Shell has actual knowledge that consumers are being deceived into unknowingly paying undisclosed fees on debit card transactions.

52.     Despite having actual knowledge of this deception, Shell continues to provide substantial and necessary assistance to the deceptive scheme alleged herein, with the specific intent of increasing its own profits.

53.     Specifically, Shell knowingly and deliberately provided substantial assistance, and continues to provide substantial assistance, to the deceptive scheme alleged herein by:

a. Creating, designing, reviewing, and approving deceptive signage to be displayed at Shell-branded Dealers;

b. Permitting Shell-branded Dealers to use and display deceptive signage;

c. Processing debit cards like credit cards and imposing the higher processing fee on debit card holders;

d. Refusing to disclose or require Shell-branded Dealers to disclose Shell's debit card processing policy.

54.    The deceptive scheme alleged herein would not be possible without Shell's substantial, knowing, and intentional assistance, which therefore aided and abetted the deceptive scheme.

55.    Shell's deceptive advertising scheme has caused massive damages to Florida consumers.

56.    There are more than 400 Shell gas stations in the state of Florida, and debit card transactions account for more than half of all gasoline purchases at those gas stations, resulting in millions of dollars of damages to consumers.

## FACTUAL ALLEGATIONS

57.    In the ultra-competitive gasoline market, where up to four competing stations are often found at a single intersection, a price difference of just a few cents can drive motorists from one dealer to another.

58.    In order to steer customers to its own Shell-branded dealers over competing dealers, Shell made a corporate-level decision to offer Split Pricing at many of its locations. Shell then specifically designed signage that advertises a cash price and a credit price but fails to disclose

12

that, pursuant to Shell's internal company policy, Shell charges the higher credit price on debit card purchases, rather than the cash price consumers expect.

59. Split Pricing generates additional sales and revenue for Shell from consumers hoping to lessen the already heavy burden of gasoline costs by using a form of payment other than credit. Split Pricing also results in additional sales and revenue from Shell Card purchases. One of the key benefits to the Shell Card is that, despite being a credit card, Shell charges cardholders the lower cash price. Without Shell's Split Pricing program, the Shell Card would lose much of its appeal.

60. The majority of consumers purchase gasoline with a debit card. When those consumers view Shell's Split Pricing signage, they must make a determination as to which price will apply to a debit card. A reasonable consumer would invariably conclude that the cash price applies because consumers consider a debit card to be a form of cash, not a credit card.

61. Shell has actual knowledge that consumers expect to pay the cash price when paying with a debit card.

62. There are many reasons why reasonable consumers consider a debit card to be a form of cash:

   a. Consumers must demonstrate a positive credit history to obtain a credit card, which is not a prerequisite to obtaining a debit card.

   b. Many consumers cannot obtain a credit card either as a result of poor credit history or an inability to afford the high interest rates and fees associated with a credit card.

13

c.   The very poorest Americans who desire the convenience and security of a debit card but cannot even open a checking account must rely on "prepaid" debit cards which explicitly warn cardholders that they are not credit cards.[8]

d.   Some state and federal government agencies also use prepaid cards to pay unemployment benefits, child support, and other government benefits such as Social Security and veterans' benefits.[9] At no point would a reasonable consumer believe that these types of prepaid debit cards are a credit card.

63. Consumers also draw a distinction between debit and credit cards based on the simple fact that a credit card charge does not deduct any cash from a cardholder's bank account. Instead, the cardholder receives a bill at the end of the month and may pay off the entire balance, or they may make a smaller payment and accrue interest on the remaining balance. In stark contrast, a debit card payment results in an immediate deduction of cash from the cardholder's checking account. In fact, many retailers, including Shell gas stations, place an additional "authorization hold" on purchases made with debit cards and pre-paid debit cards in order to ensure that the purchaser will have sufficient funds available to cover the cost of the transaction because *debit cards are not credit cards*. This authorization hold may exceed the amount of the purchase, preventing a consumer from accessing the funds in their bank account.

64. Shell has sole discretion and authority over the disclosures consumers receive. Yet, despite Shell's superior knowledge of its debit card processing policy and its actual knowledge that Shell's policy is deceptive to consumers, Shell deliberately refuses to disclose its policy.

65. Consumers paying with a debit card and expecting to pay the cash price look first to

---

[8] *See* https://usa.visa.com/pay-with-visa/find-card/get-prepaid-card (Visa repeatedly states that its prepaid debit cards are not credit cards)

[9] https://www.consumerfinance.gov/ask-cfpb/what-is-a-government-benefit-card-en-409/

the card reader, which instructs them to insert their card and then guides the consumer through the steps to authorize payment.

66. Shell's POS prompts debit card users to enter a personal identification number (PIN) when processing payment. Unlike debit cards, credit cards *never* require a PIN.   After the POS device instructs the cardholder to begin fueling, a small digital screen displays a price labeled only as "price per gallon." A reasonable consumer would not expect the price at the pump to be different from the price advertised on Shell's other signage, so there would be no reason to pay close attention to the pump's pricing. Given the small price differential between cash and credit pricing, a reasonable consumer would be unlikely to notice the discrepancy when dispensing their gas.

67. In the event that an extra-savvy consumer was to notice any difference in pricing, the only way to confirm would be to leave the fuel dispenser island and investigate pricing on the street signs, or to go into the store. The law does not require reasonable consumers to be suspicious or to investigate their suspicions.

68. The first and only time that Shell discloses its higher charge is on the sales receipt, after a sale is completed, and only if the cardholder requests one. By that time, it is too late for the consumer because unlike other retail products, consumers cannot return overpriced gasoline for a refund.

69. Shell has actual knowledge that its acts and practices alleged herein are deceptive to consumers, but refuses to correct its practices in order to continue profiting off deceived consumers. Shell has acquired actual knowledge from not only this lawsuit, but also from countless consumer complaints.

70. Plaintiff is a resident of Palm Beach County, Florida. At various times throughout the

Class Period, Plaintiff purchased gasoline from a number of Shell-branded dealers throughout Florida where Shell advertised Split Pricing.

71. Based on the fundamental differences between a debit card and a credit card, including the immediate deduction of cash from a checking account that results in a debit card transaction, Plaintiff considers a debit card to be a form of cash, not credit.

72. Plaintiff never received any prior notice of Shell's debit card processing policy of charging a higher credit price, or any amount in excess of the cash price, on debit card purchases.

73. On or about February 5, 2021, Plaintiff used her debit card to purchase gasoline from the Shell branded dealer located at 2100 W Linton Blvd, Delray Beach, FL 33445.

74. Plaintiff noticed the cash and credit prices advertised and concluded that the cash price would apply to her debit card purchase.

75. Plaintiff either did not notice the "price per gallon" displayed on the fuel dispenser or did not recognize the price to be Shell's credit price.

76. After the sale was completed, Plaintiff requested a receipt and was surprised to learn she had been charged the credit price rather than the advertised cash price that she expected to pay.

77. Plaintiff would not have purchased gasoline from Shell-branded dealers with a debt card but for Shell's knowing and intentional scheme to mislead her about the lower price per gallon for non-credit purchases.

78. As a result of Shell's false, deceptive, and misleading practices, Plaintiff suffered damages in an amount to be proved at trial, but no less than the jurisdictional minimum of this Court.

## **CLASS ACTION ALLEGATIONS**

79.    Plaintiff brings this action on behalf of herself and on behalf of all other persons similarly situated ("the Class").

80.    Plaintiff proposes the following Class definition, subject to amendment as appropriate:

> All persons who paid for Shell-branded gasoline with a debit card in the State of Florida four years from the filing of this Complaint and the present who were charged a "credit" price that was higher than the "cash" price.

Excluded from the Class are Defendant's officers, directors, and employees; any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Excluded also from the Class are members of the judiciary to whom this case is assigned, their families and members of their staff.

81.    <u>Numerosity</u>.  The members of the Class are so numerous that joinder of all of them is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, based on information and belief, the class consists of approximately tens of thousands of persons. The number of Class members is known by Shell, however, and thus may be notified of the pendency of this action by first class mail, electronic mail, or published notice.

82.    <u>Commonality</u>. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

        a.   Whether Shell created, designed, reviewed, and/or approved deceptive advertising;

        b.   Whether Shell disseminated and controlled deceptive advertising;

        c.   Whether Shell adequately disclosed its policy of charging a higher price on debit cards;

    d.   Whether Shell's acts and practices would deceive a reasonable consumer;

    e.   Whether Shell aided and abetted deceptive acts and practices that would deceive a reasonable consumer;

    f.   Whether Shell violated the Florida Deceptive and Unfair Trade Practices Act

    g.   Whether Shell's violations of the law were committed knowingly and/or intentionally;

    h.   Whether Plaintiff and Class Members suffered legally cognizable damages as a result of Defendant's misconduct;

    i.   Whether Plaintiff and Class Members are entitled to damages, treble damages, civil penalties, punitive damages, and/or injunctive relief.

83.   <u>Typicality</u>. Plaintiff's claims are typical of those of other Class Members in that Shell deceived Plaintiff in the very same manner that it deceived each of the other Class Members.

84.   <u>Adequacy of Representation</u>. Plaintiff will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiff's Counsel are competent and experienced in litigating class actions.

85.   <u>Predominance</u>. Defendant has engaged in a common course of conduct toward Plaintiff and Class Members.  The common issues arising from Defendant's conduct affecting Class Members, as described *supra*, predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

86.   <u>Superiority</u>. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most class members would likely find that the cost of litigating their individual claim is prohibitively high

and would therefore have no effective remedy. The prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each class member.

87.     Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

<u>**FOR A FIRST CAUSE OF ACTION**</u>
**VIOLATION OF FLORIDA DECPTIVE AND UNFAIR TRADE PRACTICES**
**ACT ("FDUTPA"), §§501.201 *et seq*.**
**(On Behalf of Plaintiff and All Class Members)**

88.     Plaintiff re-alleges and incorporates the paragraphs one (1) through seventy-three (73) of this Complaint as if fully set forth herein.

89.     Plaintiff is an individual and at all times was a resident of the state of Florida.

90.     At all times mentioned, Defendant was a corporation engaged in the business of selling and marketing products, including gasoline, under the Shell brand name at various places in the state of Florida and throughout the United States.

91.     As detailed herein, Defendant violated the FDUTPA by intentionally, knowingly, and deliberately creating and displaying deceptive signage that advertised cash and credit prices for gasoline with the intention of charging the higher credit price on debit card purchases, contrary to the expectations of a reasonable consumer, in order to profit off of unsuspecting consumers.

92.     In the alternative, as detailed herein, Shell is liable for knowingly providing substantial assistance to deceptive and unfair trade practices in violation of the FDUTPA.

93.     Shell's false, deceptive, and misleading advertisements regarding the true price of gasoline are likely to deceive, and in fact, did deceive members of the public, including Plaintiff and the other Class Members, who reasonably and correctly believe that a debit card is a form of cash, not credit, and therefore were induced to purchase Shell-branded gasoline through Shell's false, deceptive, and misleading representations regarding the true price of gasoline.

94.     Shell's deceptive acts and practices alleged herein deceived Plaintiff and Class Members who would not have purchased gasoline from Shell-branded dealers with a debit card but for Shell's intentional and knowingly deceptive scheme.

95.     Plaintiff and Class Members suffered damages when they were misled into paying a higher price for gasoline as a result of Defendant's deceptive and unfair practices.

**FOR A SECOND CAUSE OF ACTION**
**FRAUDULENT MISREPRESENTATION**
**(On Behalf of Plaintiff and All Class Members)**

96.     Plaintiff re-alleges and incorporates the paragraphs one (1) through seventy-three (73) of this Complaint as if fully set forth herein.

97.     At all times during the relevant time period, Shell represented that they charged customers a different price for gasoline purchases made using a credit card rather than cash. Specifically, Shell represented that cash transactions would be charged a lower price than credit card transactions.

98.     Despite the fact that *by definition* debit cards are not credit cards, Shell engaged in a uniform, consistent practice of charging the higher "credit" price for any gasoline purchases made using a debit card.

99.     Shell knew that a debit card is not a credit card.

100.    Furthermore, Shell knew that reasonable consumers do not believe that debit cards are credit cards.

101.    At all times during the relevant time period, Shell knew that it processed debit card transactions using the same pricing as credit card transactions.

102.    At all times during the relevant time period, Shell knew that debit cards were not charged at the "cash" price.

103.    Shell knowingly advertised and represented on its signage that cash transactions for gasoline would be charged at a lower rate in an attempt to induce customers to patronize Shell-branded gas stations.

104.    Shell knew that debit card customers would be induced to purchase gasoline from Shell-branded gas stations based on the belief that they would be charged the lower "cash" price.

105.    Plaintiff and Class Members purchased gasoline from Shell-branded gas stations in reliance on Shell's knowing and willful misrepresentation of its Split Pricing policy.

106.    Plaintiff and Class Members were damaged as a result of Shell's misrepresentations.

**FOR A THIRD CAUSE OF ACTION**
**NEGLIGENT MISREPRESENTATION**
**(On Behalf of Plaintiff and All Class Members)**

107.    Plaintiff re-alleges and incorporates the paragraphs one (1) through seventy-three (73) of this Complaint as if fully set forth herein.

108.    At all times during the relevant time period, Shell represented that they charged customers a different price for gasoline purchases made using a credit card rather than cash. Specifically, Shell represented that cash transactions would be charged a lower price than credit card transactions.

109.    Despite the fact that *by definition* debit cards are not credit cards, Shell engaged in a uniform, consistent practice of charging the higher "credit" price for any gasoline purchases made using a debit card.

110.    Shell knew that a debit card is not a credit card.

111.    Furthermore, Shell knew that reasonable consumers do not believe that debit cards are credit cards.

112.    At all times during the relevant time period, Shell knew that it processed debit card transactions using the same pricing as credit card transactions.

113.    At all times during the relevant time period, Shell knew that debit cards were not charged at the "cash" price.

114.    Shell knew that under its Split Pricing system, reasonable consumers would believe that debit card transactions would be charged at the "cash" price.

115.    Alternatively, Shell should have known that its representations regarding Split Pricing were false.

116.    Shell knowingly advertised and represented on its signage that cash transactions for gasoline would be charged at a lower rate in an attempt to induce customers to patronize Shell-branded gas stations. At all times, Shell maintained a pecuniary interest in the sale of Shell-branded gasoline.

117.    Plaintiff and Class Members justifiably relied on Shell's misrepresentations regarding its Split Pricing policy, including its posted signage.

118.    Plaintiff and Class Members were damaged as a result of Shell's misrepresentations.

**<u>FOR A FOURTH CAUSE OF ACTION</u>**
**Unjust Enrichment**
**(On Behalf of Plaintiff and All Class Members)**

119.    Plaintiff re-alleges and incorporates the paragraphs one (1) through seventy-three (73) of this Complaint as if fully set forth herein.

120.    Plaintiff and Class Members have conferred a benefit upon Shell by paying the higher "credit" price for gasoline purchased with their debit cards.

121.    Shell has voluntarily accepted and retained amounts paid by Plaintiff and Class Members.

122.    Given the nature of Shell's misrepresentations, which were designed to induce Plaintiff and Class Members into making purchases with their debit cards, it would be inequitable for Shell to retain the additional amounts they collected from Plaintiff and Class Members in excess of the posted "cash" price.

123.    The Plaintiff and Class Members do not have an adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

a)  For an Order certifying this action as a class action and appointing Plaintiff and her Counsel to represent the Class;

b)  For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

c)  For declaratory, injunctive, and other equitable relief as permitted by law, including enjoining Shell from continuing the unlawful practices described herein.

d)  For an award of punitive damages, as allowable by law;

e)  For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

f)  Pre- and post-judgment interest on any amounts awarded; and

g)  Such other and further relief as this court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff demands a jury trial on all issues so triable.

Dated: April 16, 2021

Respectfully submitted,

WHITFIELD BRYSON LLP

*/s/ Scott C. Harris*
Scott C. Harris
FL Bar No.: 0103905
Erin J. Ruben
NC Bar No.: 39184 *(*Pro Hac Vice)*
900 W. Morgan Street
Raleigh, NC 27603
Telephone: 919-600-5000
Facsimile: 919-600-5035
Primary: scott@whitfieldbryson.com
Primary: erin@whitfieldbryson.com
Secondary: amanda@whitfieldbryson.com

*\*Admission Pro Hac Vice to be submitted*

Robert C. Gindel Jr., Esq.
**ROBERT C. GINDEL, JR., P.A.**
1500 Gateway Boulevard, Suite 220
Boynton Beach, FL 33426
Telephone: (561) 649-2344
Facsimile: (561) 965-8550
Primary: robertgindel@robertgindel.com
Secondary: shannon@robertgindel.com

*Attorneys for Plaintiff*

24